UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
|     STANDCO INDUSTRIES, INC., | § | CASE NO. 10-37364 |
| | § | |
| DEBTOR | § | CHAPTER 11 |

### EMERGENCY MOTION OF BANK OF AMERICA, N.A. TO PROHIBIT USE OF CASH COLLATERAL AND FOR ADEQUATE PROTECTION

**THIS MOTION SEEKS AN ORDER THAT MAY ADVERSELY AFFECT YOU. IF YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE. IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY. YOU MUST FILE AND SERVE YOUR RESPONSE WITHIN 21 DAYS OF THE DATE THIS WAS SERVED ON YOU. YOUR RESPONSE MUST STATE WHY THE MOTION SHOULD NOT BE GRANTED. IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU. IF YOU OPPOSE THE MOTION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING. UNLESS THE PARTIES AGREE OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE MOTION AT THE HEARING.**

**REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.**

**AN EMERGENCY HEARING IS HEREBY REQUESTED FOR FRIDAY, SEPTEMBER 3, 2010 (ESTIMATED TIME: 2.5 HOURS).**

Bank of America, N.A. ("BOA") files this Emergency Motion of Bank of America, N.A. to Prohibit Use of Cash Collateral and for Adequate Protection (the "Motion") and respectfully states as follows:

### Preliminary Statement

For the past three months, Standco Industries, Inc. (the "Debtor") has systematically defrauded BOA and converted BOA's property to support a hopelessly insolvent enterprise. Specifically, the Debtor has (a) diverted over $100,000 in collections of accounts receivable (the

("Converted Funds") from a BOA controlled "blocked" account (b) intentionally overstated accounts receivable in the Debtor's borrowing base certificates to induce BOA to make additional advances to which Debtor was not actually entitled and (c) engaged in a stealth operation of subterfuge and misdirection to conceal its wrongful conduct. These actions have resulted in BOA being in an over-advanced position in excess of $420,000. In its final act of desperation, the Debtor filed this bankruptcy case while a Texas state court was concluding a hearing on BOA's application for a receiver and application for sequestration, only highlighting the Debtor's efforts to frustrate BOA's attempts to protect its property and rights under its agreements with the Debtor.

Under these circumstances, BOA is gravely concerned that its property and cash collateral are suffering massive diminution in value due to the management's wrongful acts. In addition, BOA is concerned that its physical collateral, in the form of real property, equipment and other personal property, including inventory, is at risk. Consequently, BOA seeks the entry of an order expressly prohibiting the use of any of its Pre-Petition Collections (as defined below) and cash collateral and requiring the Debtor provide the adequate protection requested herein.

### Jurisdiction and Venue

1. This Court has jurisdiction over the subject matter of this Motion pursuant to 28 U.S.C. § 1334(b) and the standing order of reference of the district court. This matter is a core proceeding. 28 U.S.C. § 157(b). Venue in this Court is proper under 28 U.S.C. § 1409(a).

### Background

**A.     The Bankruptcy Case**

2. On August 31, 2010 (the "Petition Date"), the Debtor filed its voluntary petition for relief under chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy

Court for the Southern District of Texas, Houston Division (the "Court"). The Debtor is authorized to continue to operate its business as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

**B.     The Debtor's Pre-Petition Secured Financing**

3.     BOA, as assignee,[1] is the lender under that certain Second Amended and Restated Loan and Security Agreement (as amended, supplemented and modified, the "Loan Agreement") entered into as of October 31, 1990 between the Debtor, as borrower and BOA's predecessor in interest – Security Pacific Business Credit Inc. ("SPBC").[2] The financing extended under the Loan Agreement consisted of term loans, in the stated principal amount of approximately $13 million and a revolving line of credit (the "Revolver"). The available financing under the Revolver is directly dependent on the amount of the Debtor's accounts receivable. In exchange for the financing provided under the Loan Agreement, the Debtor, among other things: (i) transferred title to its accounts receivable and the proceeds of the same (the "Collections") to BOA; (ii) agreed to provide various financial and operational reports to BOA; and (iii) granted BOA inspection rights of the Debtor's business and its books and records. As of the Petition Date, in excess of $10 million was due and owing BOA under the Loan Agreement.

4.     The Debtor's obligations under the Loan Documents are secured by first-priority, properly perfected and unavoidable liens in all, or substantially all, of the Debtor's assets (the

---

[1] Pursuant to the Third Loan Modification Agreement, dated October 29, 1997, SPBC assigned its rights and obligations under the Loan Agreement to BankAmerica Business Credit, Inc. ("BABC"). BABC assigned its rights to BOA under the Fourth Loan Modification Agreement, dated March 10, 2004. The Third and Fourth Loan Modification Agreements are attached as exhibits A-8 and A-9 to the Appendix of Exhibits in Support of the Motion of Bank of America to Prohibit Use of Cash Collateral and for Adequate Protection (the "Appendix") and incorporated by reference. All exhibits included in the Appendix are true and correct copies of the documents referenced and are cited as "Ex. _".

[2] *See* Loan Agreement, Ex. A-1 through A-13.

"Collateral") pursuant to that certain First Amended and Restated Deed of Trust (the "Deed of Trust") and that certain Collection Account Agreement.[3]

### C. The 2004 Tax Lien and BOA's Proposed Workouts

5. On February 4, 2004, the Internal Revenue Service (the "IRS") filed a Notice of Federal Tax Lien with the Texas Secretary of State (the "2004 Tax Lien") for unpaid taxes in excess of $160,000. At that time, the Debtor also had additional unpaid obligations to the IRS in the approximate amount of $300,000. After BOA notified the Debtor that the filing of the Tax Lien constituted an event of default under the Loan Agreement, the Debtor requested that BOA and the IRS enter into an agreement to provide for the deferred payment of the Debtor's tax obligations.

6. Thereafter, on March 8, 2004, the Debtor, BOA, and the IRS entered into that certain Tri-Party Agreement Regarding Unpaid Taxes (the "Tax Agreement").[4] Pursuant to the Tax Agreement, the Debtor agreed to pay the IRS monthly installments of $20,000 and to provide various payroll reports and confirmations of payroll deposits to the IRS. In exchange, the IRS agreed – *inter alia* – to release the 2004 Tax Lien and subordinate its liens and future liens to BOA's security interest and liens on the Collateral.[5]

7. In connection with the Tax Agreement, BOA and the Debtor entered into the Fourth Loan Modification Agreement on March 10, 2004.[6] The Fourth Loan Modification

---

[3] *See* Deed of Trust, Ex. A-2; Collection Account Agreement, Ex. A-13; UCC Financing Statement, Ex. B and UCC Continuation Statement, Ex. C.

[4] *See* Tax Agreement, Ex. A-14 at ¶ 1.

[5] The IRS further agreed: "that, until [the IRS] has received notice of the full and indefeasible payment of all obligations and liabilities owing from the Debtor to [BOA], [the IRS] **shall not file in any jurisdiction any Notice of Federal Tax Lien naming the Debtor without twenty-one (21) business days' prior written notice to [BOA]**;" and to give BOA notice, within seven (7) days, of the IRS becoming aware of any failure on the part of the Debtor to make any delivery or payment required by this Agreement or the Installment Agreement. *Id*. at ¶¶ 3 and 5 (emphasis added).

[6] *See* Fourth Loan Modification Agreement, Ex. A-9.

Agreement explicitly incorporated the Debtor's duties under the Tax Agreement, including requiring that the Debtor:

- perform "each of the agreements and covenants set forth in the [Tax Agreement], including without limitation, the timely making of each of the deliveries and payments required to be made by" the Debtor to the IRS;

- deliver to BOA copies of payroll reports and verifications of the Debtor's deposit of all required amounts with the IRS; and

- notify BOA in writing within two business days of any failure by the Debtor to perform any of the agreements and covenants set for in the [Tax Agreement], including any failure to pay any taxes when due.[7]

8.  On December 4, 2009, BOA sent a Notice of Default to the Debtor providing notice of certain events of default under the Loan Agreement resulting – *inter alia* – from the Debtor's failure (i) to perform under the Tax Agreement and (ii) to pay property and payroll taxes due and owing in the approximate aggregate mount of $182,000. Thereafter, on December 24, 2009, BOA offered to modify the Loan to permit the Debtor to satisfy its obligations to BOA, at a substantial discount, subject to definitive documentation and payoff by February 18, 2010. This offer expired by its own terms on February 19, 2010.

9.  On May 10, 2010, BOA again offered to permit the Debtor to satisfy its obligations, at a substantially reduced rate, by July 30, 2010. This offer was conditioned – *inter alia* – on (a) the Debtor's payment of all payroll, property and other tax obligations as the same became due; (b) the Debtor's agreement not to make any loans, advances or distributions to the Debtor's officers and directors in excess of $15,000 per month; and (c) no new liens being filed against the Collateral. This offer expired by its own terms on July 31, 2010.

---

[7] *Id*. at §§ 2.04-2.06.

**D.     The Debtor's Fraudulent Borrowings and Conversion of the BOA Collections**

10.     While BOA's May 10, 2010 workout offer was pending, the Debtor submitted a borrowing base certificate on May 19, 2010 that represented that the net availability under the Revolver was $182,746.44.[8] In support of this request, the Debtor represented that the value of its outstanding accounts receivable totaled $947,795.53. Based on these representations, BOA made advances to the Debtor.

11.     Shortly after BOA made these advances, in late May 2010, the Debtor began a systematic campaign of misdirection by refusing to comply with its reporting requirements under the Loan Agreement and ceasing to deliver its weekly and monthly financial reporting. Further, the Debtor refused to provide BOA access to the Debtor's books and records as provided under the Loan Agreement. As subsequently discovered by BOA, the Debtor's furtive conduct was designed to conceal the fact that the Debtor had overstated the value of its eligible accounts receivable by over **$450,000** while simultaneously diverting over **$100,000** in proceeds of its accounts receivable from the blocked account (the "Blocked Account") that had been established for the benefit of BOA.

12.     On June 4, 2010, BOA sent a Notice of Default to the Debtor based on, *inter alia*, the Debtor's failure to provide BOA access to the Debtor's records and the Debtor's failure to provide BOA with the routine reports required under the Loan Agreement. Due to a lack of any deposits into the controlled account, BOA also notified the Debtor of a potential default for the Debtor's failure to immediately deliver any Collections into the Blocked Account.

---

[8] *See* May Borrowing Base Certificate, Ex. A-15.

### E.     The June Lawsuit and the Rule 11 Agreement

13.     On June 16, 2010, BOA initiated a state court lawsuit in the 189th District Court of Harris County Judicial styled and numbered *Bank of America, N.A. v. Standco Ind., Inc.*, Cause No. 2010-36816 (the "June Lawsuit") to – *inter alia* – enjoin the Debtor's misappropriation of the Collections and compel the Debtor's performance of its reporting obligations under the Loan Agreement.  On June 24, 2010, BOA and the Debtor entered into a Rule 11 Agreement resolving the June Lawsuit (the "Rule 11 Agreement").[9]  Pursuant to the Rule 11 Agreement, the Debtor agreed – *inter alia* – to:

- deliver and deposit any checks, cash or other forms of payment received in respect of the accounts receivable to Blocked Account – as otherwise required under the Loan Agreement; and

- comply with the Debtor's reporting obligations under the Loan Agreement.

14.     In exchange, BOA agreed – *inter alia* – to forbear from the exercise of certain of its rights under the Loan Documents related to the Debtor's failure to deliver Collections between May 28 and June 24, 2010 and non-suit the June Litigation without prejudice.

15.     On June 30, 2010, the Debtor submitted a borrowing base certificate to BOA revealing that the actual amount of the Debtor's outstanding accounts receivable was only $455,462,38 (and not $975,062.87, as the Debtor had previously certified on the immediately preceding borrowing base certificate dated May 26, 2010) and that net availability under the Revolver was therefore **(-$281,228.20)** (as opposed to positive $186,955.72, the amount that the Debtor represented was available on the previous certificate).[10]  Based on the Debtor's submission of materially false borrowing base certificates to BOA, the Debtor received over $420,000 in advances to which it was not entitled.

---

[9]  *See* Rule 11 Agreement, Ex. F.

[10]  *See* May Borrowing Base Certificate Ex. A-15; June Borrowing Base Certificate. Ex. A-16.

**F.     The 2010 Tax Lien**

16.    On July 23, 2010, BOA discovered that, a day before the Debtor entered into the Rule 11 Agreement (i.e., June 23, 2010), the IRS had filed a Notice of Federal Tax Lien (the "2010 Tax Lien") with the Texas Secretary of State for approximately $153,000 in unpaid payroll taxes for the months of May and June 2009.[11]

17.    On July 29, 2010, BOA sent a Notice of Default to the Debtor based – *inter alia* – on the 2010 Tax Lien and the Debtor's failure to comply with its reporting requirements.[12]  On August 3, 2010, BOA accelerated the Debtor's obligations under the Loan Agreement[13] and informed the Debtor's account debtors and obligors under their accounts receivable that BOA was exercising its rights under the Loan Agreements to require these parties to directly pay all amounts due the Debtor to BOA.  In response, the Debtor sent letters to these parties directing its customers not to pay BOA and instead to make payments to the Debtor,[14] despite BOA's clear rights under the Loan Agreement and TEX. BUS. & COMM. CODE § 9.607(a) to directly collect these amounts from the Debtor's obligors.

**G.     The August Litigation**

18.    On August 4, 2010, BOA filed a second state court lawsuit against the Debtor in the 234th Judicial District Court of Harris County, Cause No. 2010-48024, seeking the appointment of a receiver over the Collateral.

19.    On August 6, 2010, the Debtor filed a separate lawsuit against BOA in the 334th Judicial District Court of Harris County, Cause No. 2010-48893, claiming that BOA had

---

[11] *See* 2010 Tax Lien, Ex. D.  Neither the Debtor nor the IRS provided the requisite notice under the Tax Agreement of the IRS' claims for unpaid payroll taxes and the IRS' intent to file a Tax Lien.  BOA reserves its rights with respect to this failure to notify.

[12]  *See* Notice of Default, Ex. A-17.

[13]  *See* Notice of Acceleration, Ex. A-18.

[14]  *See* Debtor's Letter to Account Debtor, Ex. A-19.

8

breached its contract with the Debtor by failing to make loan advances to the Debtor, and accusing BOA of tortiously interfering with the Debtor by attempting to directly collect the proceeds of the accounts receivable from the Debtor's obligors. The Debtor sought a temporary restraining order and temporary injunction prohibiting BOA from directly collecting the accounts receivable from the Debtor's obligors. The temporary restraining order was denied. The Debtor never set the temporary injunction for a hearing.

20. The state court scheduled a hearing to consider BOA's request for the appointment of a receiver and for sequestration on August 30, 2010 (the "<u>Receivership Hearing</u>"). On August 31, 2010, during the second day of the Receivership Hearing, the Debtor filed its voluntary petition for relief under chapter 11 of the United States Bankruptcy Code with this Court.

## Arguments and Authorities

21. BOA requests that this Court: (i) prohibit the Debtor's use of any Collections (i.e. the proceeds of accounts receivable) generated prior to the Petition Date (the "<u>Pre-Petition Collections</u>") because the Pre-Petition Collections do not constitute "cash collateral" as defined under section 363 of the Bankruptcy Code; (ii) prohibit the use of BOA's cash collateral; and (iii) require the Debtor to provide adequate protection of BOA's interests described below.

**A.   The Pre-Petition Collections are not "Cash Collateral" that may be used pursuant to Section 363 of the Bankruptcy Code.**

22. The Debtor may not use the Pre-Petition Collections pursuant to Section 363 of the Bankruptcy Code because the Pre-Petition Collections do not constitute "cash collateral". Section 363 of the Bankruptcy Code governs a debtor's request to use "cash collateral" and defines that term as cash and certain cash equivalents "in which the **estate** and an entity other that the estate **have an interest**." 11 U.S.C. § 363(a) (emphasis added). "Section 363 does not

create property interests, instead it protects parties with an interest in cash collateral." *In re Village Properties, Ltd.*, 723 F.2d 441, 444 (5th Cir. 1984). As such, a *prima facia* requirement for the use of cash collateral is that the debtor have an interest in the cash or cash equivalents. Whether the estate has an "interest" in cash or cash equivalents is determined by the definition of "property of the estate" under Section 541 of the Bankruptcy Code and applicable state law.

23.     While Section 541 of the Bankruptcy Code defines property of the estate broadly, subsection (d) expressly limits the scope of property of the estate, providing that: "[p]roperty in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest …becomes property of the estate under subsection (a)(1) or (2) of this section **only to the extent** of the debtor's legal title to such property, but **not** to the extent of any equitable interest in such property that the debtor does not hold. 11 U.S.C. § 541(d) (emphasis added). Interpreting Section 541(d), the Fifth Circuit has explained that the section "expressly provides that property in which the debtor holds only legal title, and not an equitable interest, **is not property of the estate** to the extent of a third party's interest in that property. *In re Al Copeland Enters., Inc.*, 991 F.2d 233, 235-236 (5th Cir. 1993) (emphasis added) (citing 11 U.S.C. § 541(d)); *see also Begier v. I.R.S.*, 496 U.S. 53, 59 (1990)). Section 541 does not permit a debtor to enlarge its "rights against others beyond those existing at the commencement of the case." *See In re Central Medical Center, Inc.*, 122 B.R. 568, 573 (Bankr. E.D. Mo. 1990) (emphasis added) ("Thus, a debtor may not use Section 541(a) **to divest another of property to which they rightfully have title**.") (emphasis added). To determine whether the Debtor possesses an "interest" in the Pre-Petition Collections for the purposes of Section 363 of the Bankruptcy Code, the Court looks to the Loan Agreement and Texas law.[15]

---

[15] The Loan Agreement is governed by Texas law. *See* Loan Agreement, Ex. A-1.

24. Under Texas law, whether the parties to the Loan Agreement effected a transfer of title is controlled by the intent of the parties. *See Floyd v. Am. Block Roland Niles Int'l, Inc. (In re Cooper Mfg. Corp.)*, 344 B.R. 496, 506 (Bankr. S.D. Tex. 2006) (J. Bohm). If a contract is unambiguous, court's determine the parties' intent from the four corners of the contract. *Tremont LLC v. Halliburton Energy Servs.*, 696 F. Supp. 2d 741, 840 (S.D. Tex. 2010) ("Under Texas law, '[c]ourts interpreting unambiguous contracts are confined to the four corners of the document, and cannot look to extrinsic evidence to create an ambiguity.'") (quoting *Tex. v. Am. Tobacco Co.*, 463 F.3d 399, 407 (5th Cir. 2006)); *see also Refinery Holding Co., L.P. v. TRMI Holdings, Inc. (In re El Paso Refinery, L.P.)*, 302 F.3d 343, 354 (5th Cir. 2002) (applying Texas law to limit the search for the parties' intent to the "four corners of the instrument.") (citations omitted).

25. Here, the Loan Agreement expressly provides that the Pre-Petition Collections are BOA's "sole property" and that any Collections received by the Debtor will be held in trust for BOA. Specifically, the Loan Agreement provides:

> If … [the Debtor] receive[s] any Proceeds of Accounts, **we shall receive such payments as your trustee and shall immediately deliver such payments to [BOA] in their original form duly endorsed in blank or deposit them into a Payment Account, as you may direct**. All collections received in any such lock box or Payment Account or directly by [BOA] or [the Debtor], and all funds in any Payment Account or other account to which such collections are deposited, **shall be [BOA's] sole property and subject to [BOA's] sole control**. ….
>
> All payments received by [BOA] on account of Accounts or as proceeds of other Collateral in the form of good funds **will be [BOA's] sole property and will be credited to [the Debtor's] loan account**….[16]

26. The unambiguous provisions of the Loan Agreement clearly illustrate that the parties intended to transfer title to the Collections to BOA. To further this intent, the Debtor

---

[16] *See* Loan Agreement, Ex. A-1 at ¶ 12(a) and (c) (emphasis added).

11

agreed to deposit all Collections in a controlled account and permitted BOA to request that all of the Debtor's account debtors and obligors directly pay BOA.

27. Faced with substantially similar provisions in a loan agreement, the bankruptcy court in *In re National Equipment & Mold Corp.*, held that the agreement transferred title to the accounts receivable from the debtor to its creditor. 64 B.R. 239, 245 (Bankr. N.D. Ohio 1986). In *National Equipment*, a chapter 7 trustee sought turnover of the proceeds of accounts receivable in the possession of the debtor's secured creditor. *Id.* at 244. The creditor sought dismissal of the action asserting that the estate possessed no interest in the accounts based on the terms of the loan agreement between the parties. *Id.* Analyzing whether the trustee could satisfy the *prima facia* element of a turnover action – namely, that the debtor had an interest the accounts receivable – the court analyzed the parties' loan agreement to determine whether the debtor possessed any interest in the accounts receivable under Ohio law. *Id.* at 245. Because Ohio law, like Texas law, looks to the intent of the parties to determine whether a transfer of ownership has occurred, the court began its analysis with the terms of the parties' agreement. *Id.* Like the Loan Agreement between BOA and the Debtor, the agreement in *National Equipment* provided, in relevant part:

> The undersigned agrees, until payment of all indebtedness and of liability of every kind of the undersigned to the Bank . . . to make collection of the said Receivable as agent for the Bank, and remit the proceeds thereof forthwith to the Bank.
>
> The proceeds of all collections of the Receivables **shall be the absolute property of the Bank**, and they shall not be deposited or mingled with any other moneys or funds of the undersigned.

*Id.* at 241 (emphasis added).

28. In concluding that the parties' agreement reflected an intent "for the Debtor to convey ownership of its accounts receivable to the Defendant," the court reasoned as follows:

12

> Although not expressed in language which is customarily employed in a conveyance of title, the security agreement states that "The proceeds of all collections of the Receivables shall be the absolute property of the Bank, and they shall not be deposited or mingled with any other moneys (sic) or funds of the (Debtor)." This language appears consistent with the intent of the parties to create an arrangement, in which Defendant could be assured of repayment from the Debtor's accounts. This language clearly favors a finding that the Debtor intended to convey or assign its rights in the accounts to the Defendant for this purpose. This interpretation is supported by the remaining terms of the contract, wherein the Defendant is afforded the right to collect the accounts directly from the account obligors without having to route the collection process through the Debtor. It is also supported by the fact that the Defendant was empowered to endorse the name of the Debtor on any check or bills submitted by the account debtors as payment on the account. **Such terms so clearly express the intent of the parties that there is no reasonable or rational interpretation which can be used to assert that the Debtor intended to retain any rights in the accounts subsequent to its execution of the contract**. In the absence of any such rights, it must be concluded that the Debtor had no interest in the accounts which passed to the estate with the filing of the petition.

*Id* at 245 (emphasis added).

Like the *National Equipment* agreement, the Loan Agreement:

- expressly provides that the Collections are BOA's sole property;

- affords BOA the right to collect the Collections directly from the account obligors without having to route the collection process through the Debtor;

- permits BOA to endorse the Debtor's name on checks submitted by the Debtor's customers; and

- only terminates the transfer of accounts receivable on the Debtor's full payment of the underlying loan obligations.

29.     Accordingly, like the accounts receivable transferred under the *National Equipment* agreement, the Loan Agreement effectuated a transfer of the Debtor's interest in the Pre-Petition Collections.  Because the Debtor possessed no interest in the Pre-Petition Collections under the Loan Agreement, the funds are not property of the estate under Section 541 of the Bankruptcy Code and therefore do not constitute "cash collateral" that may be used under Section 363 of the Bankruptcy Code.

**B.    BOA is entitled to Adequate Protection of its Cash Collateral and Other Collateral**

30.    To the extent that the Debtor possesses any interest in any cash collateral (as defined in Section 363), BOA possesses a first priority lien on the cash collateral and BOA expressly does not consent to the use of its cash collateral. Further, pursuant to Section 363(e) of the Bankruptcy Code, BOA requests that the Court grant BOA adequate protection of its interest in its collateral by – *inter alia* – prohibiting the Debtor's use of any cash collateral and providing a full accounting to BOA.

31.    A debtor may not use, sell or lease cash collateral unless (a) each entity that has an interest in the cash collateral consents, or (b) the court, after notice and a hearing, authorizes such use, sale or lease of the cash collateral. 11 U.S.C. § 363(c)(2). Additionally, the Court, on request of an entity that has an interest in the cash collateral, shall prohibit or condition the use, sale or lease of cash collateral as is necessary to provide adequate protection of such interest. *Id*. at § 363(e) ("the court, with or without a hearing, shall **prohibit** or condition such use, sale, or lease as is necessary to provide adequate protection of such interest.") (emphasis added). The burden of proof with regard to adequate protection in cash collateral matters is on the debtor-in-possession, with the exception that the entity asserting an interest in the cash collateral must establish the validity, priority and extent of its interest. *Id*. at § 363(p).

32.    Under the Loan Agreement, the Deed of Trust and the Collection Account Agreement, the Debtor granted BOA a security interest and liens on all of the Debtor's assets – including all of the Debtor's cash collateral (as defined in Section 363). Based on BOA's liens, the Collections (to the extent that the Debtor retains any interest in the same) and the proceeds of the Collateral constitute BOA's cash collateral. BOA does not consent to the Debtor's use of cash collateral in any manner (including for the payment of professional and other administrative

expenses).[17] BOA further asserts that the Debtor is unable to meet its burden of establishing that BOA's interests can be adequately protected such that the Debtor may use cash collateral. Absent such proof, the Court should prohibit any use of BOA's cash collateral.

33. Due to the Debtor's fraudulent actions to obtain over $420,000 in advances from BOA, and the simultaneous conversion of over $100,000 in Collections, BOA requests that, in addition to prohibiting the Debtor's use of cash collateral, the Court require the Debtor to provide the following adequate protection:

(a) require the Debtor to take all actions necessary to have all its account debtors and obligors remit payments for any Pre-Petition Collections to the Blocked Account as required under the Loan Agreement;

(b) deposit any other cash collateral of BOA that is in the possession, custody or control of the Debtor or any of the Insider (as such term is defined in 11 U.S.C. § 101) of the Debtor into a segregated debtor-in-possession account;

(c) provide a sworn statement by an officer of the Debtor specifically identifying (i) all account debtors or obligors of the Debtor that were requested to remit monies to any bank account other than the Blocked Account or directly to the Debtor, and (ii) reporting on all monies received by or for the benefit of the Debtor in the 120 day period prior to the Petition Date;

(d) provide a designee or designees of BOA with access to the Debtor's facilities to inspect and monitor the Collateral in order to prevent any losses, impairment or diminution in value of the Collateral; and

(e) permit BOA immediate access to the books and records of the Debtor, including all electronic records on any company computers, to make electronic copies, photocopies or abstracts of the business records of the Debtor.

---

[17] Without BOA's consent, the Debtor may not use cash collateral to pay administrative expenses and "[t]he debtor must look to unencumbered assets of the estate to pay administrative expenses." *In re Westwood Plaza Apartments*, Ltd., 154 B.R. 916, 921 (Bankr. E.D. Tex. 1993); *see also In re Treco*, 240 F.3d 148, 155 (2d Cir. 2001); *In re Blackwood Assocs. L.P.*, 153 F.3d 61, 68 (2d Cir. 1998); *In re Crutcher Concrete Constr.*, 218 B.R. 376, 380 (Bankr. W.D. Ky. 1998); *In re 1560 Wilson Blvd. L.P.*, 206 B.R. 819, 825 (Bankr. E.D. Va. 1996); *Daniel v. AMCI, Inc. (In re Ferncrest Court Partners, Ltd.)*, 66 F.3d 778, 782 (6th Cir. 1995); *In re Florence Discount Center,* 175 B.R. 939, 942 (Bankr. S.D. Ohio 1994); *In re Mobile Air Drilling Co., Inc.*, 53 B.R. 605, 609 (Bankr. N.D. Ohio 1985). BOA expressly reserves the rights to object to any application for compensation filed by any such professionals.

34. Based on the extraordinary circumstances of fraud in this case, BOA submits that the prompt implementation of the proposed adequate protection measures requested herein are reasonable and necessary to protect BOA's interests in its Collateral. Accordingly, BOA requests that the Court enter an order requiring the foregoing pursuant to Section 363(e) of the Bankruptcy Code.

## Reservation Of Rights

35. BOA reserves its rights to amend or supplement this Motion as it obtains further information and conducts further analyses thereon.

## Certificate Of Conference

36. Pursuant to BLR 9013(g), on August 31, 2010 Karl Burrer, counsel for BOA, conferred with Debtor's counsel to resolve the relief requested in the Motion without the necessity of a hearing. Despite these efforts, no resolution of the relief requested in the Motion was reached.

WHEREFORE, BOA prays that this Court enter an order (i) granting this Motion; (ii) prohibiting the Debtor's use of Cash Collateral; and (iii) granting BOA such other and further relief to which it is justly entitled.

Dated: August 31, 2010.                    Respectfully submitted,

                                                                       HAYNES AND BOONE, LLP

                                                                       By:  */s/ Karl Burrer*_____
                                                                       Karl Burrer
                                                                       State Bar No. 24043584
                                                                       Kenneth E. Broughton
                                                                       State Bar No. 03087250
                                                                       Michael P. Raab
                                                                       State Bar No. 24065933
                                                                       One Houston Center
                                                                       1221 McKinney St., Suite 2100
                                                                       Houston, Texas 77010-2007
                                                                       Telephone: 713.547.2021
                                                                       Telecopier: 713.236.5507

                                                                       ATTORNEYS FOR BANK OF AMERICA, N.A.

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing instrument was duly served by electronic mail, facsimile and/or United States first class mail, postage prepaid and properly addressed, to all parties listed on the attached Service List and by electronic transmission to all registered ECF users appearing in the case on August 31, 2010.

By: */s/ Karl Burrer*_____
    Karl Burrer

## SERVICE LIST

Centerpoint Energy
P.O. Box 4981
Houston, TX 77210-4981

Gener Service SRL
53 Via Casale Nuovo
83100 Avellino
ITALY

Harris County Tax Assessor
P.O. Box 4622
Houston, TX 77210-4622

Internal Revenue Service
Centralized Insolvency Unit
P.O. Box 21126
Philadelphia, PA 19114

Leonard H Simon
Pendergraft & Simon L.L.P.
2777 Allen Parkway
Ste 800
Houston, TX 77019

Standco Industries, Inc.
2701 Clinton Dr.
Houston, TX 77020

Texas Workforce Commission
12455 Beechnut
Houston, TX 77072-3948

TXU Energy
P.O. Box 650700
Dallas, TX 75265-0700

United States Bankruptcy Court
PO Box 61010
Houston, TX 77208

US Trustee
Office of the US Trustee
515 Rusk Ave
Ste 3516
Houston, TX 77002